UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:18 CR 122 SNLJ (ACL) |
| | ) |
| RANDALL C. LEWIS, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).  Pending before the undersigned are the Defendant's Motion to Suppress Evidence and Request for Hearing and *Franks* Hearing (Doc. 41) and Motion to Dismiss Superseding Indictment (Doc. 70).

First, Lewis argues that the Affidavit supporting the Search Warrant "was based on false statements made intentionally or with reckless disregard to the truth."  (Doc. 41 at p. 1.)  He claims the Affiant's statement about having received information from a Confidential Informant (CI) was false.  It was not until the day of the evidentiary hearing that Lewis identified the entirety of paragraph five of the Affidavit as being false.  Paragraph five revealed that within ten days prior to the Affiant's request for the Search Warrant, the CI reported witnessing Lewis in possession of a handgun in his home and that Lewis claimed to have used the gun in a recent shooting.  Lewis further claims the Search Warrant was issued without probable cause.

Next, Lewis argues that the Superseding Indictment (hereinafter Indictment) should be dismissed because the Government cannot show that Lewis knew "he was a convicted felon, and thus in one of the prohibited classes of people described in 18 U.S.C. § 922(g)."  (Doc. 70 at p. 1.)  Lewis claims this evidence, which he alleges does not exist, was required for the return of the Indictment under *Rehaif v. United States*, 139 S.Ct. 2191 (2019).

The Government filed Responses in opposition to Lewis' claims.  (Docs. 43, 76.)

The Government called a single witness at the evidentiary hearing, the Affiant for the Search Warrant in question.  The Government submitted exhibits, including:  1) the Search Warrant packet (Government Exhibit (Gov't. Ex.) #1), 2) a packet containing information related to Lewis' prior felony convictions for drug trafficking offenses (Gov't. Ex. #2), and 3) a copy of the Grand Jury Transcript related to the Superseding Indictment (Gov't. Ex. #3, filed under seal).  Following the evidentiary hearing, both parties submitted additional briefing.  (Docs. 95, 96.)

In consideration of the pleadings identified above, as well as all exhibits admitted into evidence, the undersigned recommends that the following findings of fact and conclusions of law be adopted and that Lewis' pretrial motions be denied.

## I.  Findings of Fact

On August 3, 2018, Alcohol, Tobacco, and Firearms (ATF) Task Force Officer (TFO) Brian Eggers applied for a Search Warrant to search the residence at 414 Washington in Cape Girardeau, Missouri.  Eggers stated that he had "probable cause to believe that Lewis, who is prohibited from possessing a firearm, is in possession of a

firearm at his residence at 414 Washington Street, Cape Girardeau, Missouri." *See* Gov't. Ex. #1, Affidavit at ¶ 2.  Eggers is also an officer with the Cape Girardeau Police Department.

### Contents of the Affidavit

Within the Affidavit, TFO Eggers set out details regarding Lewis' prior drug trafficking convictions which made him a person prohibited from possessing a firearm. He also summarized information provided by a CI who reportedly witnessed Lewis in possession of a firearm (a black semiautomatic small caliber handgun) and reported that Lewis explained his recent use of the firearm along with his need to have the gun for protection.  TFO Eggers further explained the information that led him to conclude that Lewis resided at 414 Washington.  Finally, TFO Eggers summarized details surrounding the investigation of a shooting at "The Pony" night club in McClure, Illinois, on July 22, 2018, for which a man known as "Dirty Red" was identified as one of the shooters.  TFO Eggers was familiar with Lewis and knew that Lewis' nickname was "Dirty Red."

According to the CI, Lewis reportedly showed the CI a small caliber, black, handgun and told the CI that he used the gun in a recent shooting at The Pony.  TFO Eggers stated that this interaction occurred within ten days prior to the Search Warrant Application on August 3, 2018.  The CI said that Lewis described details of the shooting, including that Lewis fired shots in the air during a quarrel with another man.  The CI indicated that Lewis carried the black handgun in a black cloth holster.  The CI stated that when Lewis showed the CI the gun, Lewis was staying at 414 Washington with his girlfriend, Krystal Sterling, as well as Sterling's child.  The CI added that Lewis parked

Page **3** of **20**

his gold Buick in the driveway at the rear of the residence. Additionally, the CI described the interior layout of the residence, including the location of Lewis' master bedroom and the child's bedroom. The CI further stated that he observed Lewis in possession of the black handgun in the dining room and the master bedroom. The CI had known Lewis for more than one year.

In an effort to corroborate the CI's information, TFO Eggers secured and reviewed reports from the agencies that investigated the July 22, 2018 shooting at The Pony. The reports reflected that the shooting at the night club, located just across the Mississippi River from Cape Girardeau in McClure, Illinois, occurred around 2:30 a.m. An employee of The Pony told investigators that one of the men involved in the shooting was known by the nickname "Dirty Red," which TFO Eggers knew to be a nickname for Lewis. An employee of The Pony stated that "Dirty Red" was regularly observed on the club's parking lot "every Friday and Saturday night." Witness statements reflected that Lewis and a man named Harris argued on the parking lot, and that Lewis shot at Harris with a handgun. Harris then entered his vehicle and fired back at Lewis. Harris had two passengers in his vehicle. Witnesses stated that "Dirty Red" fired two shots at Harris and three additional rounds into the air. Following the shooting, the man identified as "Dirty Red" and believed by law enforcement to be Lewis drove to Cape Girardeau in a silver Acadia. An unspent .40 caliber round was located near Harris' location at the time he fired his handgun at Lewis, while five nine millimeter casings were recovered from Lewis' location during the shooting.

Review of the investigative reports enabled TFO Eggers to confirm the veracity of the CI's report about Lewis' statement concerning the recent shooting at The Pony. TFO Eggers further noted that the CI had provided "reliable and credible information in the past" as it: led to the execution of search warrants and recovery of controlled substances, was consistent with information known to be true by law enforcement, and previously led to law enforcement locating and arresting subjects wanted on felony warrants. *Id*. at ¶ 7.

In addition, TFO Eggers examined school records that confirmed an 18-year-old child of Krystal Sterling lived at 414 Washington. He also reviewed license plate records for the gold Buick parked behind the residence, as well as the silver Acadia in which "Dirty Red" drove away from The Pony on July 22, 2018. The gold Buick was registered to Lewis. The Acadia, however, did not have current license plates. TFO Eggers observed both vehicles parked in the driveway of 414 Washington prior to his application for the Search Warrant.

The conclusory paragraph of TFO Eggers' Affidavit stated his belief that Lewis was in possession of a firearm along with ammunition either in the residence at 414 Washington, or within the Buick or Acadia vehicles. Finally, the paragraph above TFO Eggers' signature included a statement that the information contained within the Affidavit was true to the best of his knowledge.

### TFO Eggers' Testimony

During the suppression hearing, TFO Eggers explained that he had known Randall Lewis for several years, dating back to around August of 2014. He noted that Lewis was

known by a couple of nicknames—either "Dirty Red," or Red.  In fact, criminal history records list "Dirty Red" as an alias for Lewis.

TFO Eggers noted that since August of 2014, he encountered Lewis on a number of occasions.  Some of those interactions were traffic stops during which Lewis was driving his gold Buick Roadmaster.  TFO Eggers had also been to homes of Lewis' former girlfriend on at least two occasions when Lewis was present.  TFO Eggers was unable to recall whether Lewis had been issued traffic citations related to the traffic contacts for which he provided assistance.

Officer Eggers further testified that the CI advised him that the CI was recently in Lewis' residence at 414 Washington.  The CI explained that Lewis showed him a black handgun and that Lewis said he had used the gun during the shooting at The Pony.  Based on the investigative efforts TFO Eggers made after receiving information from the CI, he believed Lewis lived at the Washington Street residence with his girlfriend, Krystal Sterling, and her son.  TFO Eggers confirmed Sterling's and the young man's residence at 414 Washington via school records.  TFO Eggers stated that the CI's description of the interior of the residence was accurate.

TFO Eggers also conducted surveillance at the residence on multiple occasions before and after his application for the Search Warrant.  During those surveillance measures, Lewis' gold Buick was parked behind the residence and the silver Acadia was also parked at the residence.  In addition, TFO Eggers secured reports concerning the July 22, 2018, shooting at The Pony night club.  Witness statements in those reports were consistent with Lewis' account of the shooting as described to the CI.  The CI knew

Lewis lived at 414 Washington with his girlfriend and the girlfriend's son.  The CI was also aware that Lewis drove the gold Buick that was parked behind the residence.

TFO Eggers indicated he had utilized the CI as a source of information dozens of times prior to receiving the information about Lewis.  The CI was the source of information for between three and four prior search warrants that resulted in charges being brought.  TFO Eggers stated that the CI had never provided information that was later shown to be untrue.  The CI provides information in exchange for cash payments ranging from $200 to $400.  The CI did not reveal any animosity or "beef" against Lewis.

When TFO Eggers applied for the instant Search Warrant before the undersigned, he believed the information contained in the Affidavit was true.  He also thought there was probable cause to believe that a gun and ammunition would be found in the residence at 414 Washington; or within the gold Buick, or silver Acadia.  During his testimony, TFO Eggers affirmed that he continues to believe the information provided in the Affidavit is true and correct, and that the Search Warrant was valid.

Sometime after the execution of the Search Warrant, TFO Eggers realized that the bullet evidence found at the scene of The Pony shooting (9 millimeter and .40 caliber) was a different caliber than the ammunition used in the guns found at Lewis' residence (.380 and 7.62 caliber) more than two weeks later.

The undersigned finds the testimony of TFO Eggers to be credible.

### Search Warrant Execution

When the Search Warrant was executed on August 7, 2018, officers observed the gold Buick and silver Acadia were parked at the residence.  After knocking on the door,

the officers could hear movement inside the residence as if someone was running from the front of the house toward the back.  TFO Eggers announced police presence at least two times.  As the officers began to force entry, Krystal Sterling opened the door and let the officers into the living room.  Her son emerged from one of the bedrooms.  Sterling initially claimed that Lewis was not in the residence.  After an ATF Agent reported hearing noise coming from the basement, Sterling admitted Lewis was home.  TFO Eggers commanded Lewis to show himself and Lewis emerged from the basement.  He was directed to show his hands.  Lewis, who was sweating, followed the instruction and he was secured in handcuffs.  Lewis had a small piece of drywall attached to his head and he was bleeding.  The bottom of his pants were wet.  TFO Eggers asked Lewis, "What happened to you?"  Lewis replied, "I just woke up."

   The officers cleared the residence and confirmed that no one else was present.  At the bottom of the basement stairs the officers observed standing water.  Just ahead of the bottom of the stairs, they saw what appeared to be a fresh hole in the drywall as there were cobwebs on the wall near the hole but the hole didn't have cobwebs on it.  Next to the hole in the drywall was a green and black Norinco 7.62 caliber rifle.  It was loaded with 30 rounds of 7.62 ammunition and one round was chambered.  A black .380 caliber Taurus handgun with a magazine containing six rounds of ammunition was found under a couch cushion in the living room.  Sterling stated the handgun belonged to her and it was the only gun she knew to be in the house.  The black handgun found in the living room matched the description of the gun described by the CI.  A black cloth holster was found on a shelf in the basement.

**Standing**

Lewis offered the testimony of Krystal Sterling to support that he had standing to assert a reasonable expectation of privacy at 414 Washington. Insofar as Lewis' original Motion suggested he was simply an "overnight guest" at the residence to discredit the CI's statements, Sterling's testimony did not support that claim.

Sterling testified that prior to the execution of the Search Warrant, Lewis was staying at the home at least two nights or more per week. She indicated that he kept at least two changes of clothes in the home and she washed Lewis' clothing for him. Sterling further stated that Lewis was driving her silver Acadia on a near daily basis prior to the Search Warrant execution. She admitted that Lewis regularly borrowed her Acadia because Lewis' gold Buick Roadmaster that was parked behind the residence for several weeks prior to the search was not operable. Finally, Sterling described the status of her relationship with Lewis prior to the execution of the Search Warrant as being a romantic relationship. The pair married after Lewis was indicted in this Federal case.

The undersigned finds portions of Sterling's (now Krystal Lewis) testimony to be credible. To the degree that she attempted to minimize how often Lewis stayed the night at 414 Washington prior to the execution of the instant Search Warrant, the undersigned finds that Krystal Lewis' testimony lacked credibility. That said, Lewis has standing to challenge the search of 414 Washington.

**II.  Conclusions of Law**

Lewis' first argument is that TFO Eggers' Affidavit contained false information. As stated by defense counsel during the evidentiary hearing, Lewis claims that paragraph

five of the Affidavit is false in that "there was no CI ever at [Lewis'] house" who witnessed Lewis display a black handgun while claiming that he used the handgun in the recent shooting at The Pony.  (Doc. 84, Transcript of Evidentiary Hearing at pp. 30-32.)  As previously noted, the handgun that was seized as the result of the Search Warrant was capable of shooting .380 caliber bullets.  The bullets recovered at the scene of The Pony shooting that were near Lewis and the silver Acadia, on the other hand, were nine millimeter bullets.

Lewis argues that either he "showed the [CI] another handgun and bragged, or 2) the whole incident was made up by Eggers in order to obtain a warrant to search."  (Doc. 95 at p. 3.)  Lewis then attempts to present his own testimony in the post-hearing brief by stating that he "did not show another handgun to the supposed [CI]."  *Id*.  Lewis argues "it is incredibly unlikely [he] would have claimed to have used [the handgun found as a result of the Search Warrant] during the shooting."  *Id*.  Lewis sets out two potential scenarios to support his view that paragraph five is false; either the CI lied about the incident as it never happened, or TFO Eggers fabricated the CI's story.

Next, Lewis claims that if paragraph five is excised from the Affidavit, the remainder of the Affidavit fails to provide probable cause for the search.  Lewis believes that the information contained in paragraph eight, which summarizes the police reports concerning The Pony shooting incident, is not sufficient for a probable cause finding because "no names of witnesses are given, and neither is information from which one could assess credibility."  *Id*. at p. 4.

In his original Motion, Lewis challenged any suggestion by TFO Eggers that Lewis "resided" at 414 Washington. Lewis preferred to characterize his association with the residence as "an overnight guest." (Doc. 41 at p. 1.) In light of the fact Lewis established standing to challenge the Search Warrant, that argument is inconsequential.

The Government responded that Lewis' contentions are without merit and that Lewis failed to establish the required preliminary showing that would justify a *Franks* hearing. (Doc. 96 at p. 2.) The Government points out that Lewis presented "no evidence that Officer Eggers was untruthful in his affidavit." *Id*. at p. 9. As a consequence, "Lewis' unsupported allegation that Officer Eggers fabricated a [CI], does not meet the required heavy burden entitling him to a *Franks* hearing." *Id*. at p. 10. Furthermore, even if the challenged paragraph was removed, the remaining information is sufficient to support a probable cause belief that a pistol would be found at 414 Washington. Finally, the Government avers TFO Eggers' Affidavit was sufficient to establish probable cause and, if not, the "good faith" exception should be applied.

In that Lewis simply alleges that TFO Eggers' attribution of statements to the CI in paragraph five was false, the undersigned will not examine TFO Eggers' assessment that the CI was reliable and credible.

During the evidentiary hearing, the undersigned initially left the question open as to whether Lewis had established the necessary showing to warrant a *Franks* hearing. Following the direct examination of TFO Eggers to establish the Search Warrant was supported by probable cause, upon agreement from Government counsel, the undersigned

permitted defense counsel to ask the questions pertaining to a *Franks* hearing.  (Doc. 84 at p. 63.)

Lewis' second Motion requests dismissal of the Indictment based on a claim that no evidence exists to show that Lewis knew he was a prohibited person under § 922(g) as required by *Rehaif*, supra.  The Government replied that Lewis' challenge regarding the sufficiency of the evidence to prove an element of an offense is a matter to be determined by the jury as the trier of facts, "[i]t is not properly the subject of a motion to dismiss an indictment."  (Doc. 76 at p. 5.)

The undersigned will address each argument in turn.

**II.A.**  *Franks* **challenge**

Lewis alleges that TFO Eggers fabricated the information from the CI that was described in paragraph five of the Affidavit as Lewis claims he never bragged about using the .380 caliber handgun in the shooting at The Pony.  Paragraph five of the Affidavit provided:

> Within the last 10 days, an ATF confidential informant (CI) observed LEWIS in possession of a black, semiautomatic small caliber handgun. The CI observed LEWIS handling the firearm in LEWIS' residence at 414 Washington Street, Cape Girardeau, Missouri.  The CI stated LEWIS showed him/her the firearm, which had a black magazine inserted in its handle.  LEWIS carried the firearm in a black, cloth holster.  LEWIS told the CI of an ongoing dispute he was in involving another man and stated he needed the firearm for protection.  LEWIS told the CI he was involved in a recent shooting at the "Pony" in McClure, Illinois, and discussed the facts of the shooting.  LEWIS said that he fired shots in the air during the quarrel at the Pony.  LEWIS told the CI he used the black, semiautomatic small caliber handgun in the shooting.

Page **12** of **20**

(Gov't. Ex. #1, Affidavit at ¶ 5.)

Lewis claims that without paragraph five, the information in the Affidavit fails to support a probable cause belief that a gun would be found at 414 Washington. Lewis believes this claim is sufficient to entitle him to a *Franks* hearing to determine the validity of the search warrant.

When a defendant makes a "substantial preliminary showing" that an affiant for a search warrant made a false statement "knowingly and intentionally or with reckless disregard for the truth . . . the Fourth Amendment requires that a hearing be held at defendant's request." *Franks v. Delaware*, 438 U.S. 154, 155-156 (1978). The Court cautioned:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.

*Id*. at 171-72.

To satisfy the *Franks* test, a defendant's suppression motion must first show that the affiant himself either intentionally lied or that he recklessly misrepresented the truth in the affidavit. *United States v. Crook*, 936 F.2d 1012, 1014 (8th Cir.), *cert. denied*, 112 S.Ct. 974 (1991). These allegations must be accompanied by an offer or proof. *United States v. Keeper*, 977 F.2d 1238, 1242 (8th Cir. 1992). Allegations of negligence or innocent mistake are not sufficient. *Crook*, 936 F.2d at 1014. Even if a defendant identifies portions of the affidavit that he contends and swears are false, he must offer proof of the affiant's deliberate falsehood or recklessness in including the false material

in the affidavit.  *United States v. Streeter*, 907 F.2d 781, 788 (8th Cir. 1990).  Moreover, if after the contested allegations are set aside, the affidavit still contains sufficient support for probable cause, no hearing is required.  *Crook*, 936 F.2d at 1014.

In *United States v. Stevens*, 530 F.3d 714 (8th Cir. 2008), the Court stated as follows in quoting the standard to be used in determining whether a statement is knowingly false or reckless:  An affiant knowingly and intentionally or recklessly includes a false statement if he "in fact entertain[s] serious doubts as to the truth of the affidavit or ha[s] obvious reasons to doubt the accuracy of the information contained therein."  *United States v. Clapp*, 46 F.3d 795, 801 (8th Cir. 1995) (adopting the First Amendment libel standard for *Franks* inquiries).  Inaccurate statements that result from negligence or innocent mistake are insufficient to trigger relief under *Franks*.  *See Franks*, 438 U.S. at 171; *Stevens*, 530 F.3d at 718.

**II.B.i. The Defendant failed to show that the Affidavit contained false statements.**

Outside of Lewis' self-serving statement that he did not wave a black handgun in the presence of a CI, Lewis presented no evidence to show that TFO Eggers' statements contained in paragraph five were false.  TFO Eggers detailed the information that was provided by the CI and corroborated the statements through further investigation, including: 1) comparing police reports to the CI's report of how Lewis described the shooting, 2) verifying that Lewis' girlfriend and son lived at 414 Washington, 3) checking the license plates and surveilling the presence of the vehicles that were regularly parked at 414 Washington to confirm Lewis stayed at the residence, and 4) verifying the fact Lewis was a convicted felon and prohibited from possessing firearms.

TFO Eggers testified that his efforts to corroborate the CI's statements were successful and that the CI had a reliable track record providing information to him regarding criminal activity.  Furthermore, the accuracy of the CI's statements were confirmed by the evidence observed at the Search Warrant execution, including:  Lewis' presence in the early morning, both the gold Buick and silver Acadia being parked at the residence, the seizure of a black handgun, as well as a black cloth holster.

The undersigned concludes that the statements in the Affidavit that Lewis challenges were not intentionally false or recklessly made.

**II.B.ii.      Even if the challenged paragraph is excised, the Affidavit contained probable cause for the search.**

As previously noted, if after the contested allegations are set aside, the Affidavit still contains sufficient support for probable cause, no hearing is required.  *Crook*, 936 F.2d at 1014.  The Government correctly argued that even when paragraph five is not considered, the remaining paragraphs "are sufficient to support the issuance of a search warrant to search Lewis' residence located at 414 Washington for a pistol."  (Doc. 96 at p. 12.)

When the CI's information in paragraph five is excised from the Affidavit, TFO Eggers' detailed summary of the law enforcement investigation of The Pony shooting incident remains.  TFO Eggers relayed that statements from witnesses of the shooting incident identified one of the shooters as a man known as "Dirty Red" which is a known nickname for Lewis.  Not only was one of the shooters referred to by that unique nickname, but he also reportedly left the scene of the shooting in a silver Acadia headed

to Cape Girardeau.  It was reasonable for TFO Eggers to believe that the silver Acadia driven by "Dirty Red" after the shooting was the same silver Acadia that he observed parked at 414 Washington prior to applying for the Search Warrant.  TFO Eggers further confirmed that Lewis' known girlfriend lived at 414 Washington.

Even when the information contained in paragraph five of the Affidavit is not considered, probable cause for the search is still present.

As a result of the foregoing analysis, Lewis should not have been afforded the benefit of a *Franks* hearing.

### II.B.iii.  Good Faith

Alternatively, and in the event the Affidavit lacked probable cause, the "good faith" exception to the warrant requirement would apply.

While evidence obtained as a result of a potentially defective search warrant is generally inadmissible, there is an exception for evidence found by officers relying in objective good faith on a defective search warrant. *See United States v. Leon*, 468 U.S. 897, 920, 921 (1984).  There are four circumstances under which the *Leon* good faith exception does not apply.  They are as follows:

> . . .(1) the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made "in reckless disregard for the truth"; (2) " the issuing magistrate judge wholly abandoned his [or her] judicial role"; (3) the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (4) the warrant is "so facially deficient. . .that the executing officers cannot reasonably presume it to be valid."

*United States v. Guzman*, 507 F.3d 681, 685 (8th Cir. 2007). *See also Leon*, 468 U.S. 897 at 832. Lewis does not allege that any of the aforementioned exclusionary circumstances apply in this case. The record strongly supports that TFO Eggers believed the Search Warrant was valid and supported by probable cause.

Therefore, the undersigned concludes that the Warrant and Affidavit were also sufficient under *Leon* standards.

### III.     Motion to Dismiss

Lewis requests the dismissal of the Indictment based on a claim that the Government could not have proven he knew that he was a person prohibited from possessing a firearm, because no such evidence exists.

"As a general rule, an indictment is sufficient if it 'first, contains the essential elements of the charged offense and fairly informs a defendant of the charges against which he must defend, and second, enables him to plead double jeopardy as a bar to a future prosecution." *United States v. Just*, 74 F.3d 902, 903 (8th Cir. 1996) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). *See United States v. Pemberton*, 121 F.3d 1157, 1169 (8th Cir. 1997) (holding to same effect).

The Indictment in the instant case contains a plain, concise, and definite statement of the essential facts constituting the offense charged and complies in all respects with Rule 7(c) of the Federal Rules of Criminal Procedure. Moreover, the Indictment closely tracks the language of the underlying statute and, therefore, is legally sufficient. *See United States v. Oakie*, 12 F.3d 1436, 1440 (8th Cir. 1993). *See also United States v. Pennington*, 168 F.3d 1060, 1064 (8th Cir. 1999) (rejecting as meritless sufficiency challenge to indictment that,

although it alleged offense recognized by law, did not cite statute and did not use exact words in statute; language in indictment was sufficient to apprise defendant of charges and to allow him to prepare effectively for trial).

Additionally, "a pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000) (alteration added) (holding that Fed. R. Crim. P. 12(b)(2) authorizes dismissal of an indictment on the grounds that its allegations are not sufficient to charge an offense but not on the grounds that the evidence is not sufficient to prove the charges).

"In civil cases, of course, the summary judgment procedures contemplated by Federal Rule of Civil Procedure 56 may be utilized to test, pretrial, the sufficiency of the evidence to establish triable issues of fact; but there is no corollary in criminal cases. The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29 ... [W]e simply cannot approve dismissal of an indictment on the basis of predictions as to what the trial evidence will be." *United States v. Ferro*, 252 F.3d 964, 968 (8th Cir. 2001) (quoting *DeLaurentis*, 230 F.3d at 661) (alterations in original).

"It has long been settled that an indictment is not open to challenge on the ground that there was insufficient evidence before the grand jury." *United States v. Nelson*, 165 F.3d 1180, 1182 (8th Cir. 1999) (citing *Costello v. United States*, 350 U.S. 359, 363 (1956)) ("An indictment returned by a legally constituted and unbiased grand jury ... if valid on its face, is enough to call for a trial of the charge on its merits. The Fifth Amendment requires nothing

more."). As such, it was not necessary for the Government to submit the Grand Jury transcript; and the Court did not examine the testimony contained in Government Exhibit #3.

In this case, the Government sought a Superseding Indictment to add evidence to show that Lewis knew he was a prohibited person. That action was in response to the Supreme Court's decision in *Rehaif v. United States*, 139 S.Ct. 2191 (2019), holding that a defendant's knowledge "that he fell within the relevant status (that he was a felon, an alien unlawfully in this country, or the like)" is an element of a § 922(g) offense. Lewis' suggestion that there couldn't be evidence of his knowledge of his status as a felon is ludicrous. Lewis is not only a previously convicted felon, he was convicted of three separate felonies in this Court. He pled guilty in Case No. 1:03CR128 and was sentenced to serve a 49 month sentence in the Federal Bureau of Prisons on April 4, 2006.

Lewis' arguments in support of his Motion to Dismiss the Indictment on the ground of presentation of inadequate evidence to the grand jury fails. It is recommended that the Motion be denied.

## IV.  Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that Defendant Randall C. Lewis' Motions to Suppress Evidence and Request for Hearing and *Franks* Hearing (Doc. 41) and to Dismiss Superseding Indictment (Doc. 70) be **denied**.

Further, the parties are advised that they have until April 29, 2020, within which to file written objections to this Report and Recommendation, unless an extension of time

for good cause is obtained.  Failure to file timely objections may result in a waiver of the right to appeal questions of fact.  *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

                                                s/*Abbie Crites-Leoni*
                                                ABBIE CRITES-LEONI
                                                UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of April, 2020.